**J. Randolph Pickett**, OSB #72197
randy@pdw.legal
**Kimberly O. Weingart**, OSB #091407
kim@pdw.legal
**Samantha N. Stanfill**, OSB #234143
samantha@pdw.legal
**Mayra A. Ledesma,** OSB #183942
mayra@pdw.legal
**Juliana B. Minn**, OSB #195746
juliana@pdw.legal
**Hannah J. Shilling**, OSB #234095
hannah@pdw.legal
**Xavier A. Campos**, OSB #196294
xavier@pdw.legal
**PICKETT DUMMIGAN WEINGART LLP**
Centennial Block, Fourth Floor
210 S.W. Morrison Street
Portland, OR 97204
Telephone: (503) 223-7770

**UNITED STATES DISTRICT COURT**

**DISTRICT OF OREGON**

**PORTLAND DIVISION**

| | | |
|---|---|---|
| **MARIO DIAZ**, a Resident of Oregon,<br><br>Plaintiff,<br><br>v.<br><br>**SYSCO CORPORATION**,<br>a Foreign Corporation,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. 3:26-CV-00875-AR<br><br>**FIRST AMENDED COMPLAINT**<br><br>Personal Injury – Negligence –<br>Employers' Liability Law – Negligence *Per Se*<br>(Oregon Safe Employment Act)<br><br>DEMAND FOR JURY TRIAL |

**COUNT ONE**
**(Negligence)**

1.

At all times material hereto:

a) Defendant Sysco Corporation ("SYSCO") was a duly organized Delaware corporation, authorized to do business and doing business in the state of Oregon as one of the largest foodservice distributors in the world, supplying restaurants, healthcare facilities, hotels, schools, and other foodservice operators, through a nationwide network of subsidiaries and affiliated distribution companies;

b) Defendant Sysco's principal place of business was and is located at 1390 Enclave Parkway, city of Houston, county of Harris, state of Texas, and it maintains a registered agent for service of process in the state of Oregon at 1127 Broadway Street, N.E., Suite 210, in the city of Salem, county of Marion, state of Oregon;

c) Defendant Sysco operates a food distribution and restaurant supply center located at 26250 SW Parkway Center Drive, Wilsonville, county of Clackamas, state of Oregon. On information and belief, it enters into contracts with regional restaurants and schools in Oregon;

d) Defendant Sysco held an ownership interest in the property and operations located at 16123 N.E. Airport Way, city of Portland, county of Multnomah, state of Oregon;

e) Newport Meat Pacific Northwest, Inc. ("NEWPORT MEAT") is a duly organized Delaware corporation operating in the Pacific Northwest and is a wholly owned subsidiary of defendant Sysco, with a principal place of business located at 16123 N.E. Airport Way, city of Portland, county of Multnomah, state of Oregon, authorized to do business and doing business in the state of Oregon as a distributor of meat and related food products to restaurants and other foodservice customers throughout Oregon, Washington, and neighboring markets, including Multnomah County;

f) Defendant Sysco completed its acquisition of Newport Meat, which was previously known as Sysco Food Services of Oregon, Inc., in or around 1999, after which Newport Meat and its related operating entities became part of Sysco's national food service distribution system;

g) Since the acquisition, defendant Sysco has integrated Newport Meat into its corporate structure, operating it as a regional specialty meat distribution company within defendant Sysco's network of wholly owned subsidiaries;

h) The Newport Meat facility was located at 16123 N.E. Airport Way, city of Portland, county of Multnomah, state of Oregon, 97230 (the "FACILITY");

i) Newport Meat would pack Syco branded boxes with the meat produced at the Facility. Those boxes would be loaded onto Sysco trucks and were distributed to a number of customers in the region, including Ruth's Chris Steakhouse, Red Robin, and Burgerville across Oregon;

j) Plaintiff Mario Diaz ("PLAINTIFF" or "DIAZ") was and is a resident of the city of Portland, county of Multnomah, state of Oregon, and was acting in the course and scope of his employment as a meat cutter for Newport Meat;

k) Plaintiff had been working at the Facility for approximately twenty-three (23) years and had been working with the Bridge Cross Meat Tenderizer (the "BRIDGE TENDERIZER") for approximately ten (10) years; and

l) This Court has subject matter jurisdiction under 28 U.S.C. § 1332(a). Complete diversity of citizenship exists between plaintiff and defendant, and the amount in controversy exceeds $75,000, exclusive of interest and costs.

2.

On or about April 1, 2024, plaintiff Mario Diaz was working within the course and scope of his employment as a meat cutter with Newport Meat, a member of defendant Sysco's family of companies, when he was directed to clean the Bridge Tenderizer. While doing so, his hand became caught in the machine's blades, resulting in the traumatic amputation of his right index finger and a portion of his right thumb. Plaintiff was transported by Portland Fire and Rescue to the Legacy Emanuel Medical Center ("LEMC"), located in the city of Portland, county of Multnomah, state of Oregon, where he was treated for his injuries, as described in detail hereinafter.

3.

Plaintiff had worked at the Facility for approximately twenty-three (23) years at the time of the incident, and for ten (10) of those years he was assigned to work with the Bridge Tenderizer. Sysco acquired Newport Meat in or about 1999, and Newport Meat operated as a Sysco company throughout the plaintiff's entire tenure. Despite this long tenure under Sysco's ownership, plaintiff was never trained on how to safely clean the Bridge Tenderizer and was never provided access to the Operator's Manual, Maintenance Manual, or any related safety materials.

4.

According to the Oregon Occupational Safety and Health Administration ("OR-OSHA") investigative report, the Bridge Tenderizer was operated approximately five (5) days per week, six (6) hours per day, and required daily greasing of the blade shafts. This meant that plaintiff and other authorized employees regularly accessed the interior of the machine as part of their normal job duties. Approximately four (4) employees were authorized, including plaintiff, to operate the Bridge Tenderizer, and one to two (1–2) employees cleaned its interior approximately two to five (2–5) times per week. As a part of its investigation, OR-OSHA interviewed 14 people, including Mark Vaughan, Sysco's Regional Operations Director.

5.

Plaintiff never received a copy of Sysco and/or Newport Meat's lockout/tagout ("LOTO") program or its cleaning procedures for the Bridge Tenderizer in Spanish. His primary language is Spanish, and his English is limited. Whatever training he received was conducted almost exclusively in English, which he could not fully understand. He worked at the Facility for approximately twenty-three (23) years alongside a largely Spanish-speaking workforce. Despite this, neither Newport Meat nor defendant Sysco ever took steps to provide safety training, LOTO procedures, or cleaning instructions for the Bridge Tenderizer in a language their workers could actually understand. Any safety training that plaintiff received consisted of Sysco-branded videos. Newport Meat showed these videos after workers were injured. Injuries at the Facility were frequent.

6.

On April 1, 2024, the Bridge Tenderizer was leaking grease onto the meat it was processing. Plaintiff reported this to his direct supervisor, Vue Moua ("MOUA"), who had served as a production supervisor at Newport Meat for three to four (3–4) years. Rather than allowing plaintiff to clean the machine in the way he normally did, which was to move it closer to a hose area and spray down the interior blade shafts without reaching inside, Moua directed plaintiff to clean the machine at his workstation. This required plaintiff to reach into the machine's interior to clean the blade shafts by hand.

7.

OR-OSHA reviewed surveillance video of the incident and observed both plaintiff and Moua reaching into the machine interior without applying any LOTO devices, and doing so openly in view of others. When asked why he had not applied a LOTO device, Moua responded only: "I don't have an answer." LOTO was not a safety policy and procedure that was practiced, followed, or enforced at the Facility.

8.

In order to clean the Bridge Tenderizer in accordance with Newport Meat's own cleaning specifications, plaintiff was required to bypass the machine's electromagnetic interlocking system. The

only way to ensure the blades were thoroughly cleaned was to access them while the cover was open, which the interlocking system would otherwise prevent. To bypass the interlocking system, plaintiff used magnets to defeat the electromagnetic strips. He obtained those magnets and instructions on how to use them from Ernie Cuarteros ("CUARTEROS"), a co-worker and maintenance mechanic at the Facility. OR-OSHA confirmed that Cuarteros possessed spare magnets in his toolbox, and that additional spare magnets were found and removed from the maintenance shop by employer representatives following the incident. The mechanics themselves routinely used magnets to bypass the interlocking system when performing their own work on the machine. This was not a "rogue" practice by a single employee, but rather, was something done openly and regularly at the Facility. Those in charge of the Facility knew of this practice, in spite of any denials made to the OR-OSHA investigator.

9.

Before reaching into the machine to clean the blade shafts, plaintiff removed the magnet from the interlocking system. With the magnet removed, the interlocking system should have prevented the machine from operating. Despite this, the machine unexpectedly became energized while plaintiff's hand was inside, catching his hand in the moving blades.

10.

Defendant Sysco owns Newport Meat as a wholly owned subsidiary and operates it under Sysco's "One Sysco" strategy, which unifies Sysco's specialty companies, brands, and distribution networks into a single enterprise. Newport Meat identifies itself to the public and to its workforce as "a Sysco company" and conducts business through Sysco's corporate systems, including Sysco's electronic mail domain. Defendant Sysco supervised Newport Meat's operations and the safety of the work performed at the Facility. Notably, defendant Sysco's Regional Operations Director, Mark Vaughan, was present at the OR-OSHA opening conference on April 3, 2024, confirming defendant Sysco's direct involvement in and oversight of Newport Meat's operations. Upon information and belief, defendant Sysco received reports and provided support and analysis of Newport Meat's operations and provided operational support and analysis.

11.

Defendant Sysco promulgated safety policies that governed the work at the Facility and retained authority to enforce them. Its own Global Code of Conduct (effective September 2023) commits Sysco to lead "by example" by "[e]nsuring that we and those we lead understand how our Code and policies and applicable laws relate to our work." The Code further commits Sysco to promoting safety "in everything we do" by "[c]onducting risk assessments, identifying hazards, and implementing controls[;] maintaining rigorous health and safety programs and procedures[; and] never turning a blind eye to safety hazard[.]" Defendant Sysco also operates a "One Sysco" strategy, which is designed to unify its various specialty companies, brands, and distribution networks into a single, cohesive enterprise. Sysco also administers a company-wide safety program that governs operations at the Facility and requires Newport Meat to follow it. Through the Code of Conduct and that program, Sysco retained the authority to direct, inspect, audit, and correct Newport Meat's safety practices, including the lockout/tagout and cleaning procedures for the Bridge Tenderizer, and to require Newport Meat to adopt additional safety measures. In fact, all safety committee meeting attendance and minutes are captured on Sysco-branded forms. On information and belief, these forms are submitted to and retained by defendant Sysco or, in the alternative, defendant Sysco required Newport Meat to retain these forms and had the right to inspect them at any time.

12.

Defendant Sysco's commitment to safety, as expressed in its own Code of Conduct, stood in stark contrast to conditions at the Facility. The safety committee at Newport Meat had not met for approximately seven months prior to the April 1, 2024, incident, with the last meeting held on August 25, 2023. OR-OSHA cited this failure as a separate serious violation. Had the safety committee been meeting as required, the widespread practice of bypassing the Bridge Tenderizer's interlocking system, the absence of meaningful cleaning training, and the non-enforcement of LOTO procedures could have been identified and addressed.

13.

Defendant Sysco knew, or, in the exercise of reasonable care, should have known, that employees at Newport Meat routinely used magnets to override the Bridge Tenderizer's electromagnetic interlocking system. The magnets used to bypass the interlocking system were stored openly in the maintenance shop and in the toolbox of a Newport Meat mechanic, Cuarteros, and additional spare interlock components were removed from the maintenance shop by employer representatives immediately following the incident. The Facility's mechanics used these magnets in the ordinary course of their work, openly and without consequence. This practice created a reasonably foreseeable and unreasonably dangerous risk of injury or death, including the very amputation that plaintiff suffered.

14.

Defendant Sysco had actual and/or constructive notice of the practice of using magnets to bypass the Bridge Tenderizer's electromagnetic interlocking system prior to the incident. The magnets used to defeat the interlocking system were not smuggled into the Facility. The magnets were purchased by Newport Meat, made available to its employees, and routinely used by the Facility's own mechanics in the ordinary course of their work. The practice was open and recurring. A reasonable inspection of the Facility's safety practices would have revealed this practice. Defendant Sysco's failure to address it reflects either actual or constructive knowledge of the hazard, and/or a deliberate indifference to it.

15.

Defendant Sysco, through its control over Newport Meat's operations and oversight of safety program at the Facility, either knew, or, in the exercise of reasonable care, should have known, that supervisor Moua consistently prioritized production over the safety of the employees under his supervision. Moua's disregard for safety protocols, including LOTO procedures, was known, or, in the exercise of reasonable care, should have been known, to Newport Meat's management and, by extension, to defendant Sysco. Notwithstanding this actual knowledge or constructive knowledge, defendant Sysco failed to take any action to re-train, discipline, or remove Moua from his

supervisory role. As a direct and proximate result of this failure, plaintiff was directed to clean the Bridge Tenderizer without any LOTO procedure in place, leading to the injuries described herein.

16.

Sysco's own Code of Conduct required it to conduct risk assessments, identify hazards, and implement controls. Sysco sent its representatives to walk through the facility from time to time. These were announced visits so Newport Meat required massive preparation and clean up for when these inspections happened. Sysco did not conduct a reasonable inspection of the safety practices at the Facility or performed any non-planned inspections in order to witness the reality of work place practices at its Facility. Had defendant Sysco conducted such inspections, it would have discovered that LOTO procedures were not being practiced or enforced at the Facility, that employees and mechanics alike were routinely bypassing the Bridge Tenderizer's electromagnetic interlocking system using magnets purchased by Newport Meat, and that employees such as plaintiff and other operators had never received any safety training on how to safely clean the Bridge Tenderizer. Defendant Sysco's failure to inspect, identify, and correct these hazardous conditions was a substantial factor in bringing about plaintiff's injuries.

17.

Defendant Sysco was negligent in one or more of the following particulars:

a) In failing to require strict compliance with its own Global Code of Conduct with respect to workplace safety at the Facility;

b) In failing to require Newport Meat to implement and enforce a written safety program covering LOTO procedures and cleaning activities for the Bridge Tenderizer;

c) In failing to conduct adequate inspections of the Facility to identify known hazards, including the failure of supervisors and employees to apply LOTO devices, before servicing the Bridge Tenderizer, and the practice of using magnets to bypass the machine's electromagnetic interlocking system;

d) In failing to ensure that no employee was permitted to operate, clean, or service the Bridge Tenderizer without first receiving adequate training on its functions, hazards, and required safety procedures;

e) In failing to ensure that Bridge Tenderizer operators, including plaintiff, were trained on the machine's energy source, the proper use of its quarter-turn rotary disconnect switch, and the available methods to safely de-energize the machine before cleaning or servicing its interior;

f) In failing to ensure that safety training, LOTO practices and procedures, cleaning instructions, and operational and instructional safety manuals, were provided to employees, including plaintiff, in a language they could understand, despite knowledge that a significant portion of the workforce at the Facility was Spanish speaking;

g) In failing to ensure that supervisor Moua and other supervisory personnel enforced LOTO practices and procedures, and did not direct employees to clean or service the Bridge Tenderizer without first de-energizing the machine;

h) In failing to ensure that its subsidiary, Newport Meat, identified, addressed, and corrected the unsafe conditions at the Facility that were known or reasonably discoverable through routine inspection and oversight, including the absence of enforced LOTO practices and procedures, and the widespread practice of bypassing the Bridge Tenderizer's safety systems.

18.

The negligence and fault of defendant Sysco, in one or more of the particulars set forth herein, was a substantial factor in causing, contributing to, aggravating, exacerbating, and/or enhancing the following injuries, many of which are permanent in nature:

a) Complete traumatic metacarpophalangeal amputation of the right index finger;

b) Partial traumatic amputation of the right thumb at the mid-distal phalanx;

c) Post-amputation neuromas of the right thumb and index;

d) Right wrist dorsal ganglion cyst;

e) Second metacarpal boss;

f) Open fractures of the distal phalanx of the right thumb distal;

g) Open fractures of proximal and distal phalanges of the right index finger;

h) Crush injury with multiple lacerations;

i) Complex Regional Pain Syndrome ("CRPS"), Type 1, of the right arm;

j) Cervical radiculopathy;

k) Chronic postoperative right hand pain;

l) Hypersensitivity/allodynia;

m) Numbness/decreased sensation of the right thumb;

n) Edema;

o) Stiffness and limited range of motion (“ROM”) of right thumb;

p) Cold intolerance and temperature sensitivity in right hand;

q) Phantom limb pain/sensations of the right index finder;

r) Osteoarthritis of right third digit;

s) Degeneration of right third distal interphalangeal (“DIP”) joint;

t) Degeneration of right third proximal interphalangeal (“PIP”) joint;

u) Degeneration of right wrist/thumb joints;

v) Ulnar-side right wrist pain and tenderness;

w) Triangular fibrocartilage complex (“TFCC”) region tenderness;

x) Right radial nerve pathway pain and irritation;

y) Eschar on the right dorsal radial thumb tip;

z) Right hand compression/crush injury mechanism;

aa) Hypersensitivity and scar adhesions at scars and amputation sites;

bb) Nerve-related numbness and paresthesias of the right thumb and hand;

cc) Diminished light touch;

dd) Sleep disturbance and insomnia related to pain and numbness of right hand;

ee) Tenderness at stump areas of right thumb and index finger;

ff) Dorsal wrist pain as a result of wearing Wrist Widget;

gg) Anxiety and depression.

Plaintiff reserves the right to amend this Complaint at a later time to more fully describe plaintiff’s injuries as deemed necessary, and/or to conform to proof offered at trial.

19.

As a result of the aforementioned injuries, plaintiff underwent the following surgical and medical procedures:

a) Right thumb amputation;

b) Extensive irrigation and debridement;

c) Laceration repair of right thumb and index finger;

d) Right thumb incision and drainage;

e) Right index finger amputation at metacarpophalangeal ("MCP") joint;

f) Bedside revision amputation of right index finger;

g) Complex wound closures;

h) Open reduction and internal fixation ("ORIF") of the fracture of the distal phalanx of the right thumb;

i) Flap rearrangement for dorsal hand coverage;

j) Revision amputations of right thumb and index finger;

k) Tenolysis (tendon release) of the Flexor Digitorum Profundus ("FDP") and Flexor Digitorum Superficialis ("FDS") tendons of the right index finger;

l) Neuroma excisions with targeted nerve implantation into drill holes;

m) Right dorsal wrist ganglion cyst excision;

n) Osteotomy of the second right metacarpal to relieve pressure;

o) Cauterization of right thumb incision bleeder with silver nitrate;

p) Right supraclavicular brachial plexus diagnostic injection;

q) Occupational/hand therapy and rehabilitation;

r) Desensitization modalities;

s) Prosthetics including a partial hand passive prosthesis;

t) Scar and edema management;

u) Thermal/physical therapies;

v) Manual therapy;

w) Electrotherapy;

x) Medication and injections.

20.

As a result of the injuries described herein, plaintiff Mario Diaz has incurred reasonable and necessary medical, hospital, surgical, therapy, prosthetic, and rehabilitation expenses to date in the approximate sum of $500,000.00. Given the nature and extent of his injuries, including multiple surgeries, ongoing pain management, prosthetic replacement, continued occupational therapy, and anticipated future pain procedures, plaintiff will incur additional reasonable and necessary medical and rehabilitation expenses in the future in a sum to be established according to proof at trial, the present value of which is the approximate sum of $400,000.00.

21.

Plaintiff has been unable to return to work since the date of his injury and has suffered lost wages to date in the approximate sum of $130,000.00. Plaintiff was sixty-two (62) years of age at the time of the incident and had worked in the meat processing industry for approximately twenty-three (23) years. Given the permanent nature of his injuries, and with a remaining work life expectancy extending to approximately age sixty-seven (67), plaintiff suffered and will continue to suffer a loss of earning capacity and/or lost wages in the future in a sum to be established according to proof at trial, the present value of which is approximately $500,000.00. Plaintiff's total economic damages are the approximate sum of $1,530,000.00, subject to amendment to conform to proof at trial.

22.

As a result of the negligence and fault of defendant Sysco, in one or more of the particulars set forth herein, plaintiff has endured and will continue to endure significant pain and suffering, emotional distress, loss of enjoyment of life, and interference with his normal and usual activities. Plaintiff, who is currently 64 years of age and has a statistical life expectancy of approximately 20 additional years, will carry the physical, emotional, and psychological consequences of these injuries for the remainder of his life. Plaintiff is entitled to an award of noneconomic damages in a reasonable amount to be determined by the jury, not to exceed the sum of $12,000,000.00.

23.

Plaintiff is entitled to pre-judgment interest at the legal rate of 9% per annum for his economically verifiable losses from the date of loss to the date of entry of judgment herein.

24.

Plaintiff reserves the right to amend his complaint at the time of trial to more completely allege his economic losses and/or to conform to proof offered at trial.

25.

Plaintiff hereby demands a jury trial.

**COUNT TWO**
**(Employers' Liability Law)**
**(General Duty Not Based on Safety Codes)**

26.

Plaintiff realleges ¶¶1 through 25 of Count One.

27.

At all times plaintiff was acting in the course and scope of his employment relationship with Newport Meat, a defendant Sysco subsidiary, as a meat cutter.

28.

At all material times, there was in full force and effect in the State of Oregon an Employers' Liability Law ("ELL") which provided in pertinent part as follows:

> **ORS 654.305.** Generally, all owners, contractors or subcontractors and other persons having charge of, or responsibility for, any work involving a risk or danger to the employees or the public shall use every device, care and precaution that is practicable to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine or other apparatus or device, and without regard to the additional cost of suitable material or safety appliance and devices.

29.

At all material times, Sysco was an owner and/or person having charge of and responsibility for the work performed at the Newport Meat Facility, including the operation, cleaning, and servicing of the Bridge Tenderizer, which involved risk or danger to plaintiff and other employees.

30.

At all material times, defendant Sysco was subject to Oregon's Employers' Liability Law in that:

a) Defendant Sysco retained the right to control safety practices at the Facility by directing, auditing, inspecting, and/or correcting Newport Meat's operations, and its own Global Code of Conduct obligated it to ensure that Newport Meat and its employees understood and complied with Sysco's policies and applicable law;

b) Defendant Sysco was engaged in a common enterprise with Newport Meat, its wholly owned subsidiary. Sysco acquired Newport Meat in or about 1999 and integrated it into Sysco's natural distribution system, operating it under the "One Sysco" strategy that unifies its subsidiaries into a single cohesive enterprise, such that the work performed by plaintiff and other Newport Meat employees directly advanced Sysco's business interests;

c) Defendant Sysco, as an indirect employer, had actual control over the implementation and enforcement of the safety policies and procedures it required its subsidiaries, and Newport Meat in particular. Sysco administered the safety program under which Newport Meat operated, received operational reports from Newport Meat, and directed its Regional Operations Director to oversee operations at the Facility and to participate in the response to plaintiff's injury. These activities gave Sysco actual control over the safety practices governing the operation, cleaning, and servicing of the Bridge Tenderizer.

31.

Defendant Sysco failed to use every device, care, or precaution which was practical to use for the protection and safety of plaintiff's life and limb, without regard to cost, in one or more of the particulars set forth in ¶17 above, together with one or more of the following additional particulars:

a) In failing to require Newport Meat to develop and implement a safety training program that addressed, at minimum, the proper procedures for cleaning and servicing the Bridge Tenderizer, including LOTO requirements, and that was delivered in a language its workers could actually understand;

b) In failing to adopt and enforce inspection policies that would have revealed that Newport Meat supervisors and employees were routinely bypassing the Bridge Tenderizer's electromagnetic interlocking system using magnets, failing to apply LOTO devices before cleaning and servicing the machine, and doing so openly and without consequence, creating a reasonably foreseeable and unreasonably dangerous risk of serious injury or amputation;

c) In failing to implement any meaningful audit or compliance process to verify that Newport Meat was actually following Sysco's own safety and training requirements, despite Sysco's authority and obligation to do so under its Global Code of Conduct and its role as Newport Meat's parent corporation.

32.

Defendant Sysco's violations of the ELL, in one or more of the particulars set forth in ¶31 above, were a substantial factor in causing the injuries to, surgical and medical treatments of, and damages suffered by plaintiff, as set forth above in ¶¶18 through 23 of Count One.

**COUNT THREE**
**(Employers' Liability Law)**
**(Specific Duty Based on Safety Codes)**

33.

Plaintiff realleges ¶¶1 through 25 of Count One, and ¶¶27 through 31 of Count Two.

34.

At all material times there was in full force and effect in the State of Oregon the ELL which provided in pertinent part as follows:

> **ORS 654.310.** All owners, contractors, subcontractors, or persons whatsoever, engaged in the construction, repairing, alteration, removal or painting of any building, bridge, viaduct or other structure, or in the erection or **operation of any machinery**, or in the manufacture, transmission and use of electricity, or in the manufacture or use of any dangerous appliance or substance, shall see that all places of employment are in compliance with every applicable order, decision, direction, standard, rule or regulation made or prescribed by the Department of Consumer and Business Services pursuant to ORS 654.001 to 654.295, 654.412 to 654.423 and 654.750 to 654.780. (emphasis supplied)

35.

At all material times herein, there were in full force and effect certain safety codes, promulgated by the state of Oregon in the Oregon Revised Statutes ("ORS") and the Oregon Administrative Rules ("OAR"), and by the federal government of the United States in the Code of Federal Regulations ("CFR"). Defendant Sysco failed to comply with the following specific requirements, in one or more of the following particulars:

a) **ORS 654.010**. Employers to furnish safe place of employment. Every employer shall furnish employment and a place of employment which are safe and healthful for employees therein, and shall furnish and use such devices and safeguards, and shall adopt and use such practices, means, methods, operations and processes as are reasonably necessary to render such employment and place of employment safe and healthful, and shall do every other thing reasonably necessary to protect the life, safety and health of such employees.

Defendant Syco violated the aforementioned safety code by failing to provide a safe place of employment in that it failed to furnish and use the devices and safeguards reasonably necessary to protect plaintiff and other employees from the known hazards associated with the operation, cleaning, and servicing of the Bridge Tenderizer, including by failing to enforce LOTO procedures, failing to prevent employees from bypassing the machine’s electromagnetic interlocking system, and failing to adopt and implement practices, methods, and training programs reasonably necessary to render the Facility safe and healthful for the employees working there.

b) **29 CFR §1926.20.** General safety and health provisions. * * *

(b) Accident prevention responsibilities.

(1) It shall be the responsibility of the employer to initiate and maintain such programs as may be necessary to comply with this part.

(2) Such programs shall provide for frequent and regular inspections of the job sites, materials, and equipment to be made by competent persons designated by the employers.

Defendant Sysco violated the aforementioned safety code by failing to initiate and maintain an adequate accident prevention program at the Facility and by failing to provide for frequent and regular inspections of the workplace by competent persons. Had Defendant Sysco maintained such a program and conducted such inspections, it would have discovered that LOTO procedures were not being practiced or enforced, that employees and mechanics were routinely bypassing the Bridge Tenderizer’s electromagnetic interlocking system with magnets, and that workers were cleaning and servicing the machine’s interior without de-energizing it, all of which created a reasonably foreseeable and unreasonably dangerous risk of serious injury or amputation.

c) **29 CFR §1926.21** Safety training and education.

* * *

(b) *Employer responsibility.*

* * *

(2) The employer shall instruct each employee in the recognition and avoidance of unsafe conditions and the regulations applicable to his work environment to control or eliminate any hazards or other exposure to illness or injury.

Defendant Sysco violated the aforementioned safety code by failing to instruct plaintiff and other employees in the recognition and avoidance of unsafe conditions associated with the operation, cleaning, and servicing of the Bridge Tenderizer. Specifically, defendant Sysco failed to train plaintiff on the hazards of accessing the machine's interior without first de-energizing it, failed to instruct him on the proper application of LOTO devices, failed to ensure he understood that bypassing the machine's electromagnetic interlocking system with magnets was prohibited and dangerous, and failed to provide any such instruction in a language plaintiff could fully understand. As a result, plaintiff was left to clean a machine capable of causing traumatic amputation without the knowledge, training, or safeguards necessary to do so safely.

d) **29 CFR 1910.147(d)(4)(ii) The Control of Hazardous Energy (lockout/tagout)**

***Lockout or tagout device application***.

Lockout devices, where used, shall be affixed in a manner to that will hold the energy isolating devices in a "safe" or "off" position.

Defendant Sysco violated the aforementioned safety rule by failing to affix LOTO devices to the Bridge Tenderizer in a manner that would hold the energy isolating devices in a "safe" or "off" position.

e) **OAR 437-001-0760 Rules for all Workplaces.**

(1) Employers' Responsibilities.

(a) The employer must see that workers are properly instructed and supervised in the safe operation of any machinery, tools, equipment, process, or practice that they are authorized to use or apply. This rule does not require a supervisor on every part of an operation nor prohibit workers from working alone.

(b) The employer must take all reasonable means to require employees:

(A) To work and act in a safe and healthful manner;

(B) To conduct their work in compliance with all applicable safety and health rules;

(C) To use all means and methods, including but not limited to, ladders, scaffolds, guardrails, machine guards, safety belts, and lifelines, that are necessary to safely accomplish all work where employees are exposed to a hazard; and

(D) Not to remove, displace, damage, destroy, or carry off any safety device, guard, notice, or warning provided for use in any employment or place of employment while such use is required by applicable safety and health rules.

Defendant Sysco violated the aforementioned safety codes by failing to ensure that plaintiff and other employees were properly instructed and supervised in the safe operation and cleaning of the Bridge Tenderizer, and by failing to take all reasonable means to require employees to work safely, comply with applicable safety rules, use the safety devices provided for their protection, and refrain from bypassing and defeating the Bridge Tenderizer's electromagnetic interlocking system.

f) **OAR 437-001-0760 Rules for All Workplaces**

(2) Employees' Responsibilities.

(a) Employees must conduct their work in compliance with the safety rules contained in this code.

(c) It is the duty of all workers to make full use of safeguards provided for their protection. It is the worker's responsibility to abide by and perform the following requirements:

(A) A worker must not operate a machine unless guard or method of guarding is in good condition, working order, in place, and operative.

(B) A worker must stop the machine or moving parts and properly tagout or lockout the starting control before oiling, adjusting, or repairing, except when such machine is provided with means of oiling or adjusting that will prevent possibility of hazardous contact with moving parts.

(C) A worker must not remove guards or render methods of guarding inoperative except for the purpose of adjustment, oiling, repair, or the setting up a new job.

(D) Workers must report to their supervisor any guard or method of guarding that is not properly adjusted or not accomplishing its intended function.

(E) Workers must not use their hands or any portion of their bodies to reach between moving parts or to remove jams, hangups, etc. (Use hook, stick, tong, jig, or other accessory.)

(d) Workers must not remove, deface, or destroy any warning, danger sign, or barricade, or interfere with any other form of accident prevention device or practice provided which they are using, or which is being used by any other worker. (Interlock).

(h) Hazardous conditions or practices observed at any time must be reported as soon as practicable to the person in charge or some other responsible representative of the employer. (Supervisor and other workers in the area).

(i) Workers observed working in a manner which might cause immediate injury to either themselves or other workers must be warned of the danger.

(7) Inspections.

(a) All places of employment must be inspected by a qualified person or persons as often as the type of operation or the character of the equipment requires. Defective equipment or unsafe conditions found by these inspections must be replaced or repaired or remedied promptly.

Defendant Sysco violated the aforementioned safety codes by failing to: (1) ensure that LOTO procedures were followed at the Facility and, more specifically, employees were locking out the Bridge Tenderizer before cleaning its interior; (2) prevent employees from bypassing the machine's electromagnetic interlocking system; (3) ensure that the hazardous practice of defeating the interlocking system was reported to and addressed by management; (4) ensure that workers observed cleaning the machine without LOTO devices were warned and directed to stop; (5) ensure that supervisor Moua intervened when he observed plaintiff and others reaching into the machine without LOTO protection; and (6) inspect the Facility with sufficient regularity to discover and remedy these conditions.

g) **OAR 437-001-0765 Safety Committees and Safety Meetings**

(5) Your safety committee must meet on company time as follows:

***

- Monthly for all other situations (except the months when quarterly worksite inspections are performed).

***

(7) Your safety committee must establish procedures for conducting workplace safety and health inspections. Persons trained in hazard identification must conduct inspections as follows:

Table 2 - Safety committee procedures for inspections

| Where | Who | When |
|---|---|---|
| Primary fixed locations | Employer and employee representatives | Quarterly |
| Office environments | Employer and employee representatives | Quarterly |
| Auxiliary and satellite locations | Employer and employee representatives | Quarterly |
| Mobile work locations, infrequently visited sites, and sites that do not lend themselves to quarterly inspections | Employer and employee representatives or a designated person | As often as the safety committee determines is necessary |

(8) In addition to the above requirements, your safety committee must:

- Work with management to establish, amend, or adopt accident investigation procedures that will identify and correct hazards.
- Have a system that allows employees an opportunity to report hazards and safety and health related suggestions.
- Establish procedures for reviewing inspection reports and for making recommendations to management.
- Evaluate all accident and incident investigations and make recommendations for ways to prevent similar events from occurring.
- Make safety committee meeting minutes available for all employees to review.
- Evaluate management's accountability system for safety and health, and recommend improvements. Examples include use of incentives, discipline, and evaluating success in controlling safety and health hazards.

Defendant Sysco violated the aforementioned safety codes by failing to ensure that Newport Meat's safety committee met monthly as required, with the last meeting held on August 25, 2023, leaving the Facility without a functioning safety committee for approximately two-hundred-nineteen (219) days before plaintiff was injured on April 1, 2024. Had the safety committee been meeting and functioning as required, it would have been obligated to conduct regular workplace inspections, establish procedures for employees to report hazards, evaluate

accident investigations, and make recommendations to management. Those obligations, if fulfilled, would have revealed and addressed the routine bypassing of the Bridge Tenderizer's interlocking system and the non-enforcement of LOTO procedures before plaintiff was injured.

h) **OAR 437-002-0240 Adoption by Reference of 29 CFR 1910 Machinery and Machine Guarding**

29 CFR 1910.212 General Requirements for All Machines

(a) *Machine guarding* --

(1) *Types of guarding.* One or more methods of machine guarding shall be provided to protect the operator and other employees in the machine area from hazards such as those created by point of operation, ingoing nip points, rotating parts, flying chips and sparks. Examples of guarding methods are - barrier guards, two-hand tripping devices, electronic safety devices, etc.

(2) General requirements for machine guards. Guards shall be affixed to the machine where possible and secured elsewhere if for any reason attachment to the machine is not possible. The guard shall be such that it does not offer an accident hazard in itself.

(3) Point of operation guarding.

(i) Point of operation is the area on a machine where work is actually performed upon the material being processed.

(ii) The point of operation of machines whose operation exposes an employee to injury, shall be guarded. The guarding device shall be in conformity with any appropriate standards therefor, or, in the absence of applicable specific standards, shall be so designed and constructed as to prevent the operator from having any part of his body in the danger zone during the operating cycle.

(iii) Special hand tools for placing and removing material shall be such as to permit easy handling of material without the operator placing a hand in the danger zone. Such tools shall not be in lieu of other guarding required by this section, but can only be used to supplement protection provided.

Defendant Sysco violated the aforementioned safety codes by allowing employees access to magnets that disabled the Bridge Tenderizer's electromagnetic interlocking system, which was the machine's sole guarding device against employee contact with its rotating blade shafts, and by

permitting that guarding system to be routinely defeated as a matter of standard practice at the Facility, leaving the point of operation entirely unguarded during cleaning operations.

i) **OAR 437-002-0140 Adoption by Reference of 29 CFR 1910.147 Control of Hazardous Energy (Lockout/Tagout)**

(a) ***Scope, application and purpose --***

(1) ***Scope.***

(i) This standard covers the servicing and maintenance of machines and equipment in which the *unexpected* energization or start up of the machines or equipment, or release of stored energy could cause injury to employees. This standard establishes minimum performance requirements for the control of such hazardous energy.

(c) ***General –***

(1) ***Energy control program.*** The employer shall establish a program consisting of energy control procedures, employee training and periodic inspections to ensure that before any employee performs any servicing or maintenance on a machine or equipment where the unexpected energizing, start up or release of stored energy could occur and cause injury, the machine or equipment shall be isolated from the energy source, and rendered inoperative.

***

(4) ***Energy control procedure.***

(i) Procedures shall be developed, documented and utilized for the control of potentially hazardous energy when employees are engaged in the activities covered by this section. ***

(7) Training and communication.

(i) The employer shall provide training to ensure that the purpose and function of the energy control program are understood by employees and that the knowledge and skills required for the safe application, usage, and removal of the energy controls are acquired by employees. The training shall include the following:

(A) Each authorized employee shall receive training in the recognition of applicable hazardous energy sources, the type and magnitude of the energy available in the workplace, and the methods and means necessary for energy isolation and control.

(B) Each affected employee shall be instructed in the purpose and use of the energy control procedure.

(C) All other employees whose work operations are or may be in an area where energy control procedures may be utilized, shall be instructed about the procedure, and about the prohibition relating to attempts to restart or reenergize machines or equipment which are locked out or tagged out.

***

(iii) Employee retraining.

(A) Retraining shall be provided for all authorized and affected employees whenever there is a change in their job assignments, a change in machines, equipment or processes that present a new hazard, or when there is a change in the energy control procedures.

(B) Additional retraining shall also be conducted whenever a periodic inspection under paragraph (c)(6) of this section reveals, or whenever the employer has reason to believe, that there are deviations from or inadequacies in the employee's knowledge or use of the energy control procedures.

Defendant Sysco violated the aforementioned safety codes by failing to establish and maintain an effective energy control program for the Bridge Tenderizer, failing to develop and implement documented LOTO procedures for employees cleaning and servicing the machine, and failing to provide adequate training to ensure that employees understood how to isolate and de-energize the machine before accessing its interior. Specifically, defendant Sysco failed to train plaintiff and other authorized employees in the recognition of the machine's electrical energy source, the methods required to safely isolate that energy source, and the prohibition against bypassing the machine's interlocking system. Defendant Sysco further failed to retrain employees when it knew or should have known that LOTO procedures were not being followed and that the machine’s safety systems were being routinely defeated.

j) **OAR 437-002-0140 Adoption by Reference of 29 CFR 1910.147 Control of Hazardous Energy (Lockout/Tagout)**

(d) **Application of control.** The established procedures for the application of energy control (the lockout or tagout procedures) shall cover the following elements and actions and shall be done in the following sequence:

(1) Preparation for shutdown. Before an authorized or affected employee turns off a machine or equipment, the authorized employee shall have knowledge of the type and magnitude of the energy, the hazards of the energy to be controlled, and the method or means to control the energy.

> (2) Machine or equipment shutdown. The machine or equipment shall be turned off or shut down using the procedures established for the machine or equipment. An orderly shutdown must be utilized to avoid any additional or increased hazard(s) to employees as a result of the equipment stoppage.
>
> (3) Machine or equipment isolation. All energy isolating devices that are needed to control the energy to the machine or equipment shall be physically located and operated in such a manner as to isolate the machine or equipment from the energy source(s).
>
> (4) Lockout or tagout device application.
>
> (i) Lockout or tagout devices shall be affixed to each energy isolating device by authorized employees.
>
> (ii) Lockout devices, where used, shall be affixed in a manner to that will hold the energy isolating devices in a "safe" or "off" position.

Defendant Sysco violated the aforementioned safety codes by failing to ensure that authorized employees followed the required sequence of energy control steps before cleaning or servicing the Bridge Tenderizer, including failing to ensure that employees had knowledge of the machine's electrical energy source and the means to control it before shutdown, failing to ensure the machine was shut down using established procedures, failing to ensure that the machine's energy isolating device was physically operated to isolate the machine from its power source, and failing to ensure that a LOTO device was affixed to the energy isolating device and held in the safe or off position before any employee accessed the machine's interior.

36.

Defendant Sysco did not use every device, care and precaution that is practical to use for the protection and safety of life and limb, limited only by the necessity for preserving the efficiency of the structure, machine, or other apparatus or device and without regard to additional costs of suitable material or safety appliances or devices as required by ORS 654.305, by violating one or more of the safety codes set forth in ¶35.

37.

Defendant Sysco's violations of the ELL, in one or more of the particulars set forth in ¶35 above, were a substantial factor in causing the injuries to, surgical and medical treatments of, and damages suffered by plaintiff, as set forth above in ¶¶18 through 23 of Count One.

**COUNT FOUR**
**(Negligence *Per Se*)**
**(Oregon Safe Employment Act)**

38.

Plaintiff realleges ¶¶1 through 25 of Count One, ¶¶27 through 31 of Count Two, and ¶¶34 through 36 of Count Three.

39.

The Newport Meat Facility where this incident occurred was a "place of employment" within the meaning of ORS 654.005 and subject to the Oregon Safe Employment Act ("OSEA"), in that it was a fixed location where employees, including plaintiff, regularly performed work processes and operations directly related to defendant Sysco's food distribution business, including the daily operation, cleaning, and servicing of the Bridge Tenderizer.

40.

Defendant Sysco was an "owner," as that term is defined in ORS 654.005(6), in that it had ownership, control, and/or custody of the Newport Meat Facility

41.

Defendant Sysco was an "employer," as that term is defined in ORS 654.005(5), in that it had one or more employees.

42.

Defendant Sysco was a "person," as the term is defined in ORS 654.005(7), in that it is a corporation.

43.

Pursuant to ORS 654.022, defendant Sysco, as an owner and employer having charge of the Facility, was required to obey and comply with every safety and health standard, rule, and regulation prescribed by the Department of Consumer and Business Services, and to do everything necessary to secure compliance with those requirements.

44.

Defendant Sysco violated the OSEA by failing to comply with one or more of the specific safety codes set forth in ¶35 above, thereby constituting a departure from the standard of care it owed its workers, including plaintiff.

45.

Defendant Sysco's violations of the OSEA, in one or more of the particulars set forth above, were a substantial factor in causing the injuries to, surgical and medical treatments of, and damages suffered by plaintiff, as set forth above in ¶¶18 through 23 of Count One.

WHEREFORE plaintiff prays for judgment against defendants, and each of them, in the sum of $13,530,000.00; for pre-judgment interest at the legal rate of 9% per annum for his economically verifiable losses from the date of loss to the date of entry of judgment; for his costs and disbursements incurred herein; and for such other relief as the court deems just and equitable.

DATED this 26th day of June 2026.

**s/ J. Randolph Pickett**
J. Randolph Pickett, OSB #721974
randy@pdw.legal
Mayra A. Ledesma, OSB #183942
mayra@pdw.legal
PICKETT DUMMIGAN WEINGART LLP

of Attorneys for Plaintiff